**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEISHA CAPPEL, ALFONSO JONES,** | : | **CIVIL ACTION** |
| **THE ESTATE OF TAMIKA JONES** | : | |
| | : | |
| **v.** | : | **NO.  23-155** |
| | : | |
| **ASTON TOWNSHIP FIRE** | : | |
| **DEPARTMENT, TOWNSHIP OF** | : | |
| **ASTON, PROSPECT CROZER, LLC,** | : | |
| **PROSPECT CCMC, LLC, CHIEF** | : | |
| **MICHAEL EVANS, EOIN** | : | |
| **MARSHALL, AARON KISELA** | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                                    **September 19, 2023**

During the COVID-19 pandemic, Tamika Jones's family called 911 because Ms. Jones was struggling to breath, could not walk, and had extremely low blood-oxygen levels. According to the complaint, the EMTs who responded — concerned for their own safety — refused to treat her.  They left without Ms. Jones and called off an advanced life support team that had also arrived to help her.  Ms. Jones died the next day.

Ms. Jones's survivors brought this case, and it will proceed through discovery on several claims.  The immediate question is whether — taking the allegations as true — Ms. Jones's constitutional rights were violated.  There is no generally recognized constitutional right to emergency services.  But there is something called the "state-created danger" doctrine, which essentially says that state actors might violate your constitutional rights if they do something that puts you in danger.  In other words, did the EMTs act to make Ms. Jones more vulnerable to harm than if had they done nothing?  We hold that they did not.  The allegations fail to state a plausible claim under the Fourteenth Amendment because the EMTs did not create a danger, increase a preexistent risk of danger, or make Ms. Jones more vulnerable to some danger that did

not exist prior to their acts.

Outside of the constitutional claims, the personal representative of Ms. Jones's estate (her sister) also sues under Title II of the Americans with Disabilities Act and Pennsylvania law.  Her well-pleaded allegations demonstrate a plausible "regarded as" disability claim under the ADA against the municipality and its fire department.  And a few of her Pennsylvania state law claims will also move to discovery.

## I.    <u>Factual Allegations</u>[1]

On January 17, 2021, Alfonso Jones started to have trouble breathing.  DI 50-2 ¶ 32.  His family suspected he had COVID-19.  *See id.* ¶¶ 32-34.  He collapsed in his home, and his family called 911 for help.  *Id.* ¶¶ 32, 33.  The responding emergency medical technicians (EMTs), however, did not take him to the hospital.  *Id.* ¶ 33.  Instead, Keisha Cappel had to drive Mr. Jones to get treatment.  *Id.* ¶ 34.

Five days later, Mr. Jones's daughter, Tamika Jones, developed similar symptoms.  *Id.* ¶ 35.  Ms. Cappel — this time caring for her sister — had an oximeter to measure the oxygen in Ms. Jones's blood.  *Id.* ¶ 35.  Ms. Cappel first tested the oximeter on herself and measured a 99%

---

[1] The factual allegations come from Ms. Cappel's proposed second amended complaint. *See* DI 50-2.  Ms. Cappel moved for leave to add to her allegations based on information "obtained . . . after the currently pending motions."  DI 50 at 2.  She also proposes two additional causes of action — one under the Americans with Disabilities Act (ADA), and the other under the Rehabilitation Act.  *See id.* at 23-26.

We ordered defendants to respond to her motion and address any futility arguments prior to oral argument on the motions to dismiss.  *See* DI 53.  Though defendants opposed Ms. Cappel obtaining leave to amend, *see* DI 54-57, we grant her motion for purposes of deciding the present motions to dismiss.  Federal Rule of Civil Procedure 15(a)(2) allows courts to "freely give leave" to a party to amend a pleading "when justice so requires."  Amendment here is not futile, as one of the allegations in Ms. Cappel's proposed second amended complaint is at the very heart of our analysis of her constitutional claims.  *See infra* Section IV.A.  We also conclude that her ADA and Rehabilitation claims are plausible.  *See infra* Section IV.B.

blood-oxygen level.  *Id.*

Ms. Jones's blood-oxygen level was much lower — 42%.  *Id.*  Her low oxygen percentage, difficulty breathing, and struggle to walk caused Ms. Cappel to act.  *Id.*  Seeking medical guidance, Ms. Cappel called her mother-in-law, a former nurse, who told Ms. Cappel that she should call 911.  *Id.*  So Ms. Cappel called Delaware County's 911 center and explained Ms. Jones's condition.  *Id.* ¶ 36.

A Basic Life Support (BLS) unit and Advanced Life Support (ALS) unit were deployed in response.  *Id.* ¶ 36, 38.[2]  On their way to Ms. Jones's house, the BLS unit — consisting of Eoin Marshall and Aaron Kisela (together, "the EMT-Bs") — "discussed" how Mr. Kisela would remain outside of the home, and how they would "pressure" Ms. Jones into "not go[ing] to the hospital regardless of her medical needs."  *Id.* ¶ 53.  The particular BLS unit normally dispatches "two career EMT-Bs," but Mr. Marshall was a new employee.  *Id.* ¶ 38.

The BLS unit arrived at Ms. Jones's house first.  *Id.* ¶¶ 38-39.  Paramedic Brian Doherty — part of the ALS unit — arrived three minutes after.  *Id.* ¶ 39.  Mr. Marshall followed Ms. Cappel into the basement where Ms. Jones was, *id.* ¶ 40, while Mr. Kisela "stayed outside the front door," *id.* ¶ 39.

Ms. Cappel explained Ms. Jones's condition to Mr. Marshall, including her low blood-oxygen level.  *Id.* ¶ 40.  Mr. Marshall questioned whether Ms. Jones could actually have a 42% blood-oxygen level, saying it was "impossible because if it were [42%] she would be dead."  *Id.* (alteration in original).  Mr. Marshall then used his own oximeter on Ms. Jones, which showed a

---

[2] Unlike a BLS unit, an ALS unit receives special training to help individuals having trouble breathing.  *Id.* ¶ 36.  An ALS unit can, for example, "start an IV and . . . utilize Albuterol and/or CPAP in cases of respiratory distress."  *Id.*

35% blood-oxygen level. *Id.* ¶ 41. Nevertheless, he said that oximeters cannot be trusted because "they never work." *Id.*

Mr. Marshall did not check Ms. Jones's vital signs, *id.* ¶ 41, until Ms. Cappel demanded that he do so, *see id.* ¶ 47. Mr. Marshall listened to Ms. Jones's lungs using a stethoscope and said they sounded clear. *Id.* And when Ms. Cappel asked Mr. Marshall "why [Ms. Jones] was panting rapidly like a dog," Mr. Marshall replied, "[t]hat's what Covid patients look like." *Id.* ¶ 46.

Mr. Marshall also told Ms. Jones that he "could" take her to a hospital, but her best option was staying home because "they will just bring you back home." *Id.* Ms. Jones asked Mr. Marshall what he would do under the circumstances, to which Mr. Marshall responded, "I'd stay here. They are really wanting people to stay home. Your best chance is to stay here." *Id.* So, Ms. Jones remained in her basement.[3]

Mr. Marshall went back upstairs after finishing his evaluation. *Id.* ¶ 51. He asked Mr. Kisela — his partner and the more senior EMT-B — whether he wanted to evaluate Ms. Jones.

---

[3] Under Aston Township Fire Department protocol, an EMT is allowed to permit a patient to "refus[e] . . . medical evaluation, treatment and/or *transport*" if four conditions are met: "(a) [t]he patient is conscious and alert, and has the freedom to act with undue influence from family or friends; and (b) [t]he patient's medical condition is stable, and thus not subject to the doctrine of implied consent; and (c) [t]he patient possesses sufficient information about the associated risks and benefits of all treatment options, which include refusal of care; and (d) the patient has the ability to use this information to make a decision and communicate their choice." *Id.* ¶ 27 (emphasis added).

Should a patient refuse a medical evaluation, treatment, and/or transport, the protocol requires first responders to call "Medical Command." Medical Command is "an emergency doctor" who has "an opportunity to convince the patient to accept a ride to the hospital from the EMT." DI 50-2 ¶ 49. According to Ms. Cappel's allegations, "[o]nly Medical Command can be the final sign-off in deciding not to transport a patient." *Id.* Here, neither Mr. Marshall nor Mr. Kisela contacted Medical Command. *See id.* ¶ 50.

*Id.*  Mr. Kisela declined and said that he had "a wife and kids to think about."  *Id.* ¶ 51.[4]  Nor did Paramedic Doherty — part of the ALS unit — evaluate Ms. Jones.  Instead, Mr. Kisela instructed Paramedic Doherty to "leave the scene" after he sat outside the Jones's home for about three minutes.  *Id.* ¶ 43.  And following the evaluation, the EMT-Bs summarized their interaction with Ms. Jones in an "incident report" — writing "No Patient [was] Assessed."  *Id.* ¶ 54.

Ms. Jones's condition worsened.  The next day, Ms. Jones's family called 911 again.  *Id.* ¶ 56.  Unfortunately, this time, the first responders could not aid Ms. Jones, and she was pronounced dead.  *Id.* ¶ 57.  Her "primary cause of death was bilateral lobar pneumonia, with a secondary cause of 'probable Covid-19.'"  *Id.* ¶ 57.

## II.   <u>Motions to Dismiss</u>

Ms. Cappel, in her individual capacity and as "the duly appointed representative of the Estate of Tamika Jones,"[5] sued a number of parties in the wake of these tragic events.  DI 50-2 ¶ 2.  She claims several of them violated Ms. Jones's constitutional rights under 42 U.S.C. § 1983, as well as state law.

First, Ms. Cappel alleges that the responding EMT-Bs deprived Ms. Jones of her Fourteenth Amendment rights "by engaging in affirmative conduct that placed [Ms.] Jones in greater danger."  *Id.* ¶ 65.  Second, she asserts a *Monell*[6] claim against Aston Township Fire Department (the Fire Department) and Aston Township for implementing policies, customs, or

---

[4] Ms. Jones's two aunts overheard Mr. Kisela's statement.  *Id.*

[5] Alfonso Jones — Ms. Jones's father — is also a plaintiff in this lawsuit.  As is the estate of Ms. Jones, which asserts wrongful death and survival causes of action under Pennsylvania law.  For brevity, we will incorporate both parties in our references to Ms. Cappel.

[6] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

practices that violated Ms. Jones's due process rights.  *See id.* ¶¶ 70-75.  Third, she alleges that supervisors from Aston Township's Fire Committee and the Fire Department violated Ms. Jones's rights through their "aware[ness] . . . allow[ance], approv[al], and ratifi[cation]" of unconstitutional policies, customs, or practices.  *See id.* ¶¶ 76-83.

Fourth, Ms. Cappel alleges that the Fire Department and Aston Township unlawfully discriminated against Ms. Jones under the Americans with Disabilities Act (ADA) and Rehabilitation Act.  *See id.* ¶¶ 84-96, 97-104.  Fifth, Ms. Cappel brings a host of Pennsylvania state law claims against several parties.[7]

Ms. Cappel's state law claims specifically include Prospect Crozer, LLC, and Prospect CCMC.  The Prospect companies contract with Aston Township "to provide advanced life support (ALS) medics based at" the Fire Department.  *Id.* ¶ 17.  They "are involved in training BLS paramedics, as well as developing or setting policy for" the Fire Department.  *Id.* ¶ 18. Prospect Crozer, LLC and Prospect CCMC, LLC answered Ms. Cappel's amended complaint,[8]

---

[7] Counts six and seven of Ms. Cappel's second amended complaint allege forms of gross negligence against Crozer, the individual members of Aston Township's Fire Committee, and individuals from the Aston Township Fire Department.  *See* DI 50-2 ¶¶ 105-09.  Count eight is an intentional or negligent infliction of emotional distress claim against the same parties.  *See id.* ¶¶ 115-18.  Counts nine and ten are wrongful death and survival actions, respectively, brought by Ms. Jones's estate.  *See id.* ¶¶ 119-25.

[8] *See* DI 32.  Prospect Crozer, LLC and Prospect CCMC, LLC have not answered Ms. Cappel's second amended complaint yet because Ms. Cappel's motion for leave to file a second amended complaint is currently pending.  The Crozer defendants did, however, respond to Ms. Cappel's motion for leave.  *See* DI 55.  They "deny all allegations" in her proposed second amended complaint.  *Id.* at 1.

leaving the Fire Department[9] and Aston Township[10] as the parties requesting dismissal.  *See* DI 34, 39.

### A.  The Fire Department's Motion to Dismiss

The thrust of the Fire Department's motion is that qualified immunity shields Mr. Marshall and Mr. Kisela from liability.  *See* DI 39-1 at 3-25.

The Fire Department argues Ms. Jones has no "constitutional right" to emergency services.  *See id.* at 4-11.  It argues that neither a "special relationship" nor "state-created danger" transforms Ms. Cappel's claim of "non-feasance" into some constitutionally guaranteed, "affirmative obligation on the [s]tate" to rescue or provide for Ms. Jones.  *Id.* at 5 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)).  The Fire Department also maintains that the "novel" COVID-19 pandemic made Ms. Jones's right to emergency services far from "clearly established."  *Id.* at 24.

Further, the Fire Department attacks Ms. Cappel's supervisory liability claim under § 1983.  It argues that Ms. Cappel's claims against the department's supervisors are too "broadly stated" to support a viable cause of action.  *See id.* at 25-26.  And the Fire Department also

---

[9] Incorporated in our reference to the Fire Department's motion are individual defendants Michael Evans, Eoin Marshall, and Aaron Kisela.  *See* DI 39.  Kenny Dawson, Thomas Morgan, Sr., and Sean Joyce, all originally defendants, have been voluntarily dismissed from the action. *See* DI 59 at 2.

[10] Incorporated in our reference to Aston Township are individual members of its Fire Committee that Ms. Cappel alleges violated her constitutional rights.  At the time of Aston Township's motion to dismiss, *see* DI 34, Ms. Cappel could not identify their specific names. *See* DI 34 at 8 (referencing "three unnamed Fire Committee members").  But in Ms. Cappel's proposed second amended complaint, she identifies the fire committee members.  *See* DI 50-2 ¶ 5 ("In January of 2021 the Fire Committee was comprised of Aston Township commissioners Joe McGinn Jr., Nancy Bowden and Les Berry . . . .").
      To streamline our analysis, we will refer to the township and the members of its fire committee as Aston Township.

argues that Pennsylvania's Political Subdivision Tort Claims Act (PSTCA) bars Ms. Cappel's state law causes of action. *See id.*[11]

Ms. Cappel responds by enunciating "five separate physical actions" taken by Mr. Marshall and Mr. Kisela "that altered the status quo and 'created a danger,' making [Ms. Jones] 'more vulnerable' than had they not acted at all." DI 44 at 3. She argues her allegations meet the Third Circuit's requirements for a plausible state-created danger claim. *Id.* at 15 (referencing *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004)). She believes qualified immunity does not apply because she had a clearly established right to not be "abandon[ed] . . . in a dangerous situation, provided that" Mr. Marshall and Mr. Kisela knew of the risk presented. *Id.* at 16.

Ms. Cappel also clarified her state law claims in her response. She said she is bringing state law tort claims against individual defendants, "[w]hich are not barred by the" PSTCA. *Id.* at 17.

### B. Aston Township's Motion to Dismiss

Aston Township advances the same argument as the Fire Department: "there is no right to emergency services whether competent or incompetent," and any exception to this general rule

---

[11] The Fire Department addressed Ms. Cappel's ADA and Rehabilitation Act claims after we ordered it to respond to Ms. Cappel's motion for leave to file a second amended complaint. *See* DI 53, 57. It argues that, "notwithstanding whether COVID-19 may qualify as a 'regarded as' disability in certain circumstances [under the ADA], *potential* infection with COVID-19 is not a 'physical or mental impairment that substantially limits one or more major life activities.'" DI 57 (quoting 42 U.S.C. § 12102(2)(A)). The Fire Department cited to a number of recent cases from courts across the country that it believes support its position.

Ms. Cappel replied to the Fire Department's response. *See* DI 59. She argues that Mr. Marshall and Mr. Kisela "refused to evaluate" Ms. Jones because they "regarded her as [being] Covid positive," thus, they denied her the benefits of the Fire Department's protocol and procedures for "suspected Covid patients." *Id.* at 12, 13. She further maintains that Ms. Jones did not have a "minor" disability, such that the "transitory and minor" exception to the ADA does not apply. *See id.* at 14-16; *see also infra* Section IV.B.

8

does not apply.  DI 34 at 5.  Aston Township further argues that, even if we conclude Ms. Cappel

stated a plausible constitutional claim, her *Monell* claim fails absent a plausible showing of a

policy or custom, "maintained 'with deliberate indifference as to its known or obvious

consequences.'"  *Id.* at 8-9 (quoting *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir.

2000)).  Regarding the individual members of the township's fire committee, Aston Township

argues that Ms. Cappel's allegations fall short of demonstrating that they held policymaking

authority.  *Id.* at 8.

Moreover, Aston Township argues that the PSTCA renders it immune from Ms. Cappel's

state law claims.  *See id.* at 11-12.  This includes Ms. Cappel's wrongful death and survival

causes of action, which the township insists "are not causes of action," but "rather . . . provide a

means of recovery."  *Id.* at 13 (quoting *Sullivan v. Warminster Township*, 2010 WL 2164520, at

*6 (E.D. Pa. May 27, 2010)).[12]

In response, Ms. Cappel reiterates her argument that the state-created danger theory of

liability applies to Mr. Marshall's and Mr. Kisela's conduct.  *See* DI 43 at 5-10.  On this

constitutional basis, Ms. Cappel insists that her allegations plausibly demonstrate *Monell* liability

and supervisory liability against the individual Fire Committee members.  *Id.* at 11-12.

We have jurisdiction over Ms. Cappel's federal and state law claims.  *See* 28 U.S.C.

§§ 1331, 1367(a).  The motions to dismiss are ripe for disposition.  For the reasons set forth

below, we grant in part and deny in part the motions.

---

[12] Like the Fire Department, we ordered Aston Township to respond to Ms. Cappel's
proposed ADA and Rehabilitation Act claims after she moved for leave to amend her complaint.
*See* DI 53.  Aston Township gave the added claims little attention.  *See* DI 54 at 2.  It argues that
Ms. Cappel's causes of action are "undeveloped" and fail to explain whether Ms. Jones alleged
disability is "related to COVID or a pre-existing disability."  *Id.*

III.     <u>**Standard of Review**</u>

A complaint must "state a claim . . . that is plausible on its face" to withstand a motion to dismiss. *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To assess the plausibility of Ms. Cappel's complaint, we use the Third Circuit's three-step test. "The first step in that process requires an articulation of the elements of the claim." *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022). The second step is "identify[ing] allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The third step is "assum[ing] the veracity of well-pleaded allegations 'and then determin[ing] whether they plausibly give rise to an entitlement to relief.'" *Chandler v. La-Z-Boy, Inc.*, 621 F. Supp. 3d 568, 572 (E.D. Pa. 2022) (quoting *Connelly*, 809 F.3d at 787).

IV.     <u>**Analysis**</u>

   A.  **The allegations do not demonstrate that the individual EMT-Bs, municipal entities, or supervisors violated Ms. Jones's constitutional rights.**

The main question is whether qualified immunity shields the EMT-Bs from liability. "[T]he judicially created doctrine of qualified immunity 'balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). We ask two questions when deciding whether qualified immunity attaches: (1) do "the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) was "the right at issue . . . 'clearly established' at the time of

defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (citations omitted).  We do not have

to answer question one before question two.  *See id.* at 236.

Here, we answer question one first: has Ms. Cappel plausibly alleged that Mr. Marshall

and Mr. Kisela violated Ms. Jones's Fourteenth Amendment rights?  She has not, which affects

the remainder of her claims.

> 1. *Ms. Cappel does not state a plausible claim under the "state-created danger" doctrine of the Fourteenth Amendment.*

The so-called state-created danger doctrine originated with *DeShaney v. Winnebago*

*County Department of Social Services*.  489 U.S. 189 (1989).  In *DeShaney*, the Supreme Court

held that state actors do not violate the Fourteenth Amendment by "fail[ing] to protect an

individual from private violence."  *Id.* at 197.  The plaintiff in *DeShaney*, a four-year old boy,

had endured severe physical abuse from his father.  *Id.* at 192-93.  The boy sued a local

department of social services — which knew about the abuse, and at one point even held the boy

in its own custody only to return him to his abusive father — for "failing to intervene to protect

him against the risk of violence at his father's hands of which they knew or should have known."

*Id.* at 193.

The Court said that the Fourteenth Amendment operates "as a limitation on the State's

power to act, not as a guarantee of certain minimal levels of safety and security."  *Id.* at 195.

Because the Due Process Clause does not "require the State to provide its citizens with particular

protective services, it follows that the State cannot be held liable under the Clause for injuries

that could have been averted had it chosen to provide them."  *Id.* at 196-97.  The Court rejected

an "expansion of the Due Process Clause" by holding the department of social services had "no

constitutional duty to protect" the boy from his father.  *Id.* at 201, 203.

Yet courts extracted the state-created danger exception from one sentence in the *DeShaney* opinion.  In discussing two cases[13] that held the government must care for incarcerated or institutionalized individuals,[14] the Supreme Court reasoned that "[w]hile the State may have been aware of the dangers that [the four-year old boy] faced in the free world, it played no part in their creation, nor did it *do anything to render him any more vulnerable to them*." *Id.* at 201 (emphasis added); *see also Johnson v. City of Philadelphia*, 975 F.3d 394, 398 (3d Cir. 2020) ("From those simple words — 'played no part in their creation' and 'render him any more vulnerable' — sprang a considerable expansion of the law.").

The Third Circuit first applied the state-created danger doctrine in *Kneipp v. Tedder*.  95 F.3d 1199, 1205 (3d Cir. 1996).  And since *Kneipp*, the Third Circuit has recognized  "four common elements" in state-created danger claims, *id.* at 1208, as "clarified" in *Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006).  The elements are:

(1) the harm ultimately caused was foreseeable and direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a

---

[13] *See id.* at 201 (referencing *Estelle v. Gamble*, 429 U.S. 97 (1976) and *Youngberg v. Romeo*, 457 U.S. 307 (1982)).

[14] This exception to *DeShaney*'s rule is termed the "special relationship" exception.  *See Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) ("The Court found that the special relationship which would impose affirmative duties of care and protection on the state existed only in certain limited circumstances, such as when the state takes a person into its custody and holds him there against his will.").  The Fire Department argues the "special relationship" exception does not apply to Ms. Cappel's cause of action, *see* DI 39-1 at 11-12, but Ms. Cappel does not argue that the exception applies.  Thus, we will not address it.

> danger to the citizen or that rendered the citizen more vulnerable to danger
> than had the state not acted at all.

*Ye v. United States*, 484 F.3d 634, 637-38 (3d Cir. 2007) (quoting *Bright*, 443 F.3d at 281).[15]

Here, the Fire Department challenges Ms. Cappel's ability to plead parts two and four of

the state-created danger test. *See* DI 39-1 at 12-22. We conclude Ms. Cappel has plausibly

alleged that the EMT-Bs acted in a manner that shocks the conscience. But we part from Ms.

Cappel on prong four and hold that the alleged state acts did not make Ms. Jones more

vulnerable to a danger than if the EMT-Bs never acted in the first place. Thus, the allegations do

not demonstrate a plausible constitutional claim.

     a.   <u>Mr. Marshall's and Mr. Kisela's alleged conduct shocks the conscience.</u>

Generally speaking, the Third Circuit has said that deciding what conduct shocks the

conscience "depends upon the circumstances of a particular case." *Estate of Smith v. Marasco*,

430 F.3d 140, 153 (3d Cir. 2005) (quoting *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d

Cir. 1999)); *see also id.* at 154 n.11 ("As the Supreme Court has acknowledged, the question

whether conduct which is neither intentionally harmful nor merely negligent 'shocks the

---

[15] The Supreme Court has not analyzed the state-created danger exception, and the Third Circuit's four-part test controls here. *Johnson*, 975 F.3d at 399-400; *see Mears v. Connolly*, 24 F.4th 880, 883 (3d Cir. 2022); *see also Vorobyev v. Bloomsburg Univ.*, 2022 WL 1499278, at *2 (3d Cir. May 12, 2022). Some courts have fairly questioned whether the exception is unmoored "from the text of the Constitution or any other positive law." *Johnson*, 975 F.3d at 400; *see id.* at 404-05 (Matey, J., concurring); *see also Tangradi v. City/County of Philadelphia*, 2022 WL 815804, at *6 n.7 (E.D. Pa. Mar. 17, 2022) (questioning the "viability" of the state-created danger doctrine as applied); *see also Fisher v. Moore*, 73 F.4th 367, 372, 374 (5th Cir. 2023) (holding "the right to be free from state-created danger is not clearly established" for purposes of qualified immunity, and stating "[w]e are particularly hesitant to expand the reach of substantive due process" to the state-created danger exception); *Murguia v. Langdon*, 2023 WL 4568517, at *1-2 (9th Cir. July 18, 2023) (Bumatay, J., dissenting). The four-part test suggests a limiting principle for the doctrine, but this case among many others illustrates the difficulties in reaching a sound conclusion on varied and often tragic facts.

conscience' is frequently 'a matter for closer calls.'" (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998))).  The "shocks the conscience" standard applies "to emergency medical personnel." *Rivas*, 365 F.3d at 196.

    To help decide what conduct shocks the conscience, the Third Circuit categorizes facts in one of three ways.  *See Kendra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017); *Phillips v. County of Allegheny*, 515 F.3d 224, 241 (3d Cir. 2008).  First, "[i]f the circumstances are highly pressurized, it is necessary to show intentional harm by the state actor." *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 171 (3d Cir. 2017).  Second, "[i]n situations in which the state actor is required to act 'in a matter of hours or minutes,' we require that the state actor 'disregard a great risk of serious harm.'" *Kedra*, 876 F.3d at 437 (quoting *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006)).  Third, "where the actor has time to make an 'unhurried judgment[],' a plaintiff need only allege facts supporting an inference that the official acted with a mental state of 'deliberate indifference.'" *Id.* (alteration in original) (quoting *Sanford*, 456 F.3d at 309).

    For example, in *Rivas v. City of Passaic*, the Third Circuit applied the second category to the conduct of two EMTs, who "consciously disregarded a great risk of serious harm" to a man having a seizure.  365 F.3d at 196.  The EMTs were responsible for the initial medical response to help the man.  *Id.* at 185.  The parties disputed whether, upon responding, the EMTs were attacked by or involved in a physical altercation with the man.  *Id.* at 196.  The interaction caused the EMTs to call for police backup, but the EMTs did not tell the police that the man was having a seizure.  *Id.* at 186.  Instead, one of the police officers that arrived as backup knew only "that a male patient inside the apartment had assaulted [an EMT]."  *Id.* at 186.

    The police officers — without knowledge of the man's true condition, and believing the man assaulted an EMT — struggled to restrain the man, leading to his death.  *See id.* at 186-88.

The Third Circuit held that "[a] jury could find" the EMTs conduct shocked the conscience because they "misrepresent[ed] the assault . . . abandoned [the man] to the police . . . abdicate[d] their duty to render medical assistance," and "placed [the man] in greater danger by falsely accusing him of acting violently." *Id.* at 196.

Here, Ms. Cappel argues that the EMT-Bs' conduct is "eerily similar" to the EMTs in *Rivas*. DI 44 at 13. The Fire Department argues that the EMT-Bs' conduct "does not shock the conscience, as it amounts to an allegation that [they] failed to understand the necessity of a hospital transport and advise accordingly." DI 39-1 at 21. Based on the well-pleaded allegations, we disagree with the Fire Department.

The allegations plausibly demonstrate a "situation[] in which the state actor is required to act 'in a matter of hours or minutes.'" *Kedra*, 876 F.3d at 437 (quoting *Sanford*, 456 F.3d at 310). Mr. Marshall and Mr. Kisela responded to a 911 call stating that Ms. Jones struggled to breathe. *See* DI 50-2 ¶ 36. So on one hand, the 911 call evinces a level of medical immediacy such that the EMT-Bs could not make an "unhurried judgment." *Sanford*, 456 F.3d at 309; *cf. Phillips*, 515 F.3d at 241 (holding deliberate indifference standard applied to 911 dispatchers who "had no information" from a call that "would have placed them in a 'hyperpressurized environment'" or indicated a "sense of urgency or emergency"). But on the other hand, the encounter with Ms. Jones did not present the same type of "highly pressurized" environment that requires a showing of intentional harm. *See L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 246 (3d Cir. 2016) (citing *Sanford*, 456 F.3d at 309) (stating "high-speed police chase" is a situation requiring intent); *cf. Vargas v. City of Philadelphia*, 783 F.3d 962, 974 (3d Cir. 2015) (concluding "hyperpressurized environment" existed where officers "came in response to a 911 call noted simply as 'person screaming' and they in fact encountered a group of screaming,

15

frantic adults and an unconscious child").  Rather, this situation is something less than hyperpressurized — akin to the situation faced by the responding EMTs in *Rivas*.  So, we look for well-pleaded facts demonstrating that Mr. Marshall and Mr. Kisela "disregard[ed] a great risk of serious harm."  *Sanford*, 456 F.3d at 310.

Like the EMTs in *Rivas*, Mr. Marshall's and Mr. Kisela's conduct shows that they "abdicate[d] their duty to render medical assistance."  *Rivas*, 365 F.3d at 196.  The two allegedly agreed before treating Ms. Jones that Mr. Kisela would remain outside the Jones's home.  DI 50-2 ¶ 53.  They also agreed beforehand to "pressure" Ms. Jones to "not go to the hospital."  *Id.*; *see also Bentler v. Nederostek*, 2023 WL 3510822, at *6 (M.D. Pa. May 17, 2023) (holding conduct shocked the conscience where dispatchers "intentionally and/or with disregard to a great risk of harm, downplayed the gravity" of individual's "mental instability" during 911 call).

Further, Mr. Marshall neglected two separate blood-oxygen readings that showed Ms. Jones's unstable breathing condition, commenting "she would be dead" if the oximeters measured accurately.  DI 50-2 ¶ 41.  Mr. Marshall did not check Ms. Jones's vital signs until Ms. Cappel asked him to.  *Id.* ¶ 47.  And Mr. Kisela commented that he had "a wife and kids to think about" after declining to evaluate Ms. Jones's condition.  *Id.* ¶ 51.  This, all while knowing before arrival that Ms. Jones "was struggling to breath[e]."  *Id.* ¶ 36.  Therefore, Ms. Cappel has plausibly alleged that the EMT-Bs' conduct shocked the conscience.

  b. <u>Mr. Marshall's and Mr. Kisela's affirmative acts did not render Ms. Jones more vulnerable to danger than had they not acted at all.</u>

The fourth element of the state-created danger doctrine is where Mr. Cappel runs into problems.  The Third Circuit has said "[t]he three necessary conditions to satisfy the fourth element of a state-created danger claim are that: (1) a state actor exercised his or her authority,

(2) the state actor took an affirmative action, and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all." *Ye*, 484 F.3d at 639. Here, Aston Township mainly argues that Ms. Cappel fails to plausibly allege prongs two and three.[16] Regarding prong two, it argues that Ms. Cappel's "allegations amount to an assertion that" the EMT-Bs "failed to adequately assist" Ms. Jones — not that they acted affirmatively. DI 39-1 at 14. Regarding prong three, it argues that any alleged "affirmative conduct" did not "limit[] [Ms. Jones's] ability to care for herself, or access outside support." *Id.* at 15 (quoting *Wilkins v. City of Philadelphia*, 2017 WL 3263891, at *3 (E.D. Pa. July 31, 2017)).

In response to the Fire Department, Ms. Cappel argues that the EMT-Bs took "at least" five distinct, affirmative actions that increased her vulnerability to harm. DI 44 at 3. The actions include:

- "waiving off an ALS Unit with EMT-Ps that Delaware County sent to help";

- "put[ting] hands on [Ms. Jones] by listening to her lungs and measuring her blood oxygen but conceal[ing] their specialized knowledge of the dire state of her condition";

- choosing "to cut [Ms. Jones] off from physician level care" by not calling to "consult with medical command";

- "cut[ting] her off from other care" by "walk[ing] up the stairs," knowing she "could not walk"; and

- "fil[ing] a false report of 'no patient assessed' to hide their actions."

---

[16] Regardless, we conclude that Ms. Cappel has satisfied prong one at the pleadings stage; Mr. Marshall and Mr. Kisela exercised their authority by responding to evaluate Ms. Jones. *See Ye*, 484 F.3d at 639 (discussing "authority" requirement and rejecting argument that authority must be "solely within the province of the state" because of *Rivas*, where "call[ing] the police" is "an action that any private citizen can legitimately take").

*Id.* at 3-7 (cleaned up).  Viewing the facts in the light most favorable to Ms. Cappel under the Third Circuit's analytical framework, we conclude she has plausibly alleged that the EMT-Bs took two affirmative acts: dismissing the ALS unit from the Jones's home, and reporting "no patient assessed" after evaluating Ms. Jones's condition.  The other actions are really inactions — the EMT-Bs *failing* to do something — reframed as affirmative acts.

Nevertheless, the two affirmative acts did not make Ms. Jones more vulnerable to danger than had the EMT-Bs not acted at all.  The two acts did not create a new danger to Ms. Jones, increase her risk of suffering from some private harm, or prevent her for accessing some form of private assistance.   Therefore, the well-pleaded allegations do not show a plausible deprivation of Ms. Jones's Fourteenth Amendment rights.

i.   *The EMT-Bs affirmatively acted by dismissing the ALS unit from the Jones's home and filing a false incident report.*

The Third Circuit rejects "attempts to redefine clearly passive inaction as affirmative acts."  *Morrow v. Balaski*, 719 F.3d 160, 178 (3d Cir. 2013).  At bottom, "an alleged failure to *do something*, standing alone, cannot be the basis for a state-created danger claim."  *Johnson*, 975 F.3d at 401.  The Third Circuit has, however, noted the "inherent difficulty in drawing a line between an affirmative act and a failure to act."  *L.R.*, 836 F.3d at 242; *see also id.* ("Often times there is no clear line to draw; virtually any action may be characterized as a failure to take some alternative action."); *see also Doe, L.S. v. City of Philadelphia*, 2023 WL 5246307, at *11 (E.D. Pa. Aug. 15, 2023) ("The 'dispositive factor' under this element is 'whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission.'" (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 915 (3d Cir. 1997))).

18

Where helpful, courts have slightly reframed the analysis of whether an affirmative act occurred.  *See, e.g.*, *L.R.*, 836 F.3d at 242; *Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*, 765 F. App'x 802, 809 n.50 (3d Cir. 2019); *Spruill v. Sch. Dist. of Phila.*, 569 F. Supp. 3d 253, 265 (E.D. Pa. 2019).  The reframing starts by "first evaluat[ing] the setting or the 'status quo' of the environment before the alleged act or omission," and then asking "whether the state actor's exercise of authority resulted in a departure from that status quo."  *L.R.*, 836 F.3d at 243.  The goal of reframing the analysis inherently overlaps with "clarify[ing] whether the state actor's conduct" actually created a danger.  *Id.*

But sometimes the Third Circuit does not explicitly employ the "status quo" analysis. *See, e.g.*, *Mears v. Connolly*, 24 F.4th 880, 885 (3d Cir. 2022); *Vorobyev v. Bloomsburg Univ. of Pa.*, 2022 WL 1499278, at *2-3 (3d Cir. May 12, 2022).  Regardless, the purpose of pinpointing an affirmative act is "to distinguish where . . . officials might have done more . . . [from] cases where . . . officials created or increased the risk itself."  *Morrow*, 719 F.3d at 179 (quoting *id.* at 186 (Ambro, J., concurring)).

"Giving and then taking away support" is an affirmative act.  *Mears*, 24 F.4th at 885.  In *Mears*, the Third Circuit held that a nurse affirmatively acted by leaving a room where a mother visited her unstable son in a psychiatric hospital.  *Id.*  Hospital staff "encouraged" the mother to visit her son, and the staff "were supposed to supervise all patient meetings."  *Id.* at 883.  When the supervising nurse departed the room mid-visit, the son attacked his mother.  *Id.*  The Third Circuit said the nurse departing the room was "more than 'failure to provide protection' or 'to warn of a threat.'"  *Id.* (quoting *Walter v. Pike County*, 544 F.3d 182, 195 (3d Cir. 2008)).

But merely assuring someone's well-being does *not* constitute an affirmative act.  *See Ye*, 484 F.3d at 640.  For example, in *Ye*, a doctor assured an individual whose father suffered from

heart problems that his condition "was nothing to worry about." *Id.* at 635.  Relying on the

doctor's representation, the individual "did not seek emergency medical assistance" for his

father.  *Id.*  The individual found his father unconscious "later that day . . . suffering from"

significant heart problems.  *Id.*  The Third Circuit held the doctor did not affirmatively act by

assuring the individual, explaining that the "factual basis" of the Supreme Court's *DeShaney*

decision "strongly suggests that mere assurances do not fall into the Court's third category of

'other' restraints on personal liberty."  *Id.* at 641; *see also Mears*, 24 F.4th at 884 (holding a

doctor's "encouragement" for a mother to visit her son in a psychiatric hospital "did not rob [the

mother] of her power to choose whether to visit" and thus was not an affirmative act).

Here, Mr. Marshall and Mr. Kisela affirmatively acted twice.  First, they took support

away from Ms. Jones by waving off the ALS unit.  DI 50-2 ¶ 44.  Waving off medical assistance

is not a failure to do anything; it is undoubtedly an act.  And the action parallels the conduct of

the nurse in *Mears*, who initially provided support for the mother visiting her son — only to

withdraw it during the visit.

And using the Third Circuit's "reframing" in *L.R.*, the status quo changed at the Jones's

house after the EMT-Bs acted.  Before the action, Paramedic Doherty "sat outside the Jones

residence for 3½ minutes."  *Id.* ¶ 43.  After the affirmative act, the environment changed:

Paramedic Doherty left the Jones's home.  Thus, the EMT-Bs affirmatively acted.

Second, Mr. Marshall and Mr. Kisela affirmatively acted by filling out an incident report

detailing their evaluation of Ms. Jones.  Had Mr. Marshall and Mr. Kisela merely *failed* to do

something, they would not have written the report at all.  Unlike the statements in *Ye* and *Mears*,

the incident report is not an assurance or misrepresentation made to Ms. Jones or Ms. Cappel.

Therefore, filing the incident report is an affirmative act.[17]

The other alleged affirmative acts, however, are repackaged *failures* to act.  For example, Ms. Cappel's argument that the EMT-Bs chose not to call medical command is another way of saying the EMT-Bs *failed* to call.  *See Morrow*, 719 F.3d at 178 (declining to hold that "a school's alleged failure to enforce a [school] policy is equivalent to an affirmative act").  Her argument that the EMT-Bs cut her off from care by leaving her in the basement is another way of saying the EMT-Bs *failed* to escort her up the stairs.[18]  And her contention that the EMT-Bs "concealed" their true knowledge of Ms. Jones's condition from "either the ALS medics" or "medical command" is a *failure* to transmit information — not an affirmative act.

Ms. Cappel urges us to rely on *Rivas* to conclude that "concealing" Ms. Jones's medical condition is an affirmative act.  *See* DI 44 at 5.  She argues that the first responders' failure to inform police officers of the individual's seizure in *Rivas* is comparable to the EMT-Bs' concealment of Ms. Jones's condition from the ALS unit or medical command.  *See id.*  We are not persuaded.  The Third Circuit has considered the "critical affirmative act" in *Rivas* as "call[ing] the police," which then led to the miscommunications regarding Mr. Rivas's medical condition.  *Ye*, 484 F.3d at 639 (analyzing *Rivas*).  True, the Third Circuit referenced the first responders' failure to "advise the [police] officers about Mr. Rivas's medical condition as an

---

[17] The "status quo" reframing is not as useful when analyzing the incident report because the EMT-Bs wrote it *after* they evaluated Ms. Jones.  As noted, the framework is just another tool to aid courts in deciding when a risk is "created" or "increased" through state action.  *See Morrow*, 719 F.3d at 179 (quoting *id.* at 186 (Ambro, J., concurring)).

[18] Our analysis might be different if the EMT-Bs had moved Ms. Jones into the basement to evaluate her condition from a different part of the house, potentially placing her in greater danger.  But upon arrival, Ms. Jones "was on a bed" in a "basement room" of the home.  DI 50-2 ¶ 40.

"act[]" that contributed to Mr. Rivas's inability to "remain[] in [his] apartment's bathroom for the duration of his seizure." *Rivas*, 365 F.3d at 197. But the first responders' omission — i.e., their failure to "advise the [police] officers" — was only part of the Third Circuit's conclusion and subsequent to the key act: "the [first responders'] decision to call for police backup." *Id.* As the Third Circuit concluded, Mr. Rivas would not have been deprived of his freedom to remain in his bathroom undisturbed had the first responders not called the police in the first place. *Id.*

Ms. Cappel's argument regarding the concealment of Ms. Jones's condition is more like the facts of *Johnson v. City of Philadelphia*. 975 F.3d 394 (3d Cir. 2020). In *Johnson*, a family trapped inside a burning building called 911 for help. *Id.* at 397. The initial phone operator directed firefighters to the wrong address. *Id.* A second phone operator corrected the address, but the operator never informed the firefighters that a family was trapped in the burning building. *Id.* The Third Circuit held that the failure "to communicate the Johnson [f]amily's location to the firefighters . . . is a classic allegation of omission, a failure to do something." *Id.* at 401 (footnote omitted); *see also Morrow*, 719 F.3d at 178-79 (rejecting plaintiff's efforts to "morph passive inaction into affirmative acts" by arguing a school district could have taken additional steps to prevent a bully from interacting with certain students).

Here, the use of the word "concealment" connotes an active step, but is a misdirection from the fact that the EMT-Bs failed to provide information about Ms. Jones's condition. Like the operator in *Johnson*, the EMT-Bs certainly could have supplied more information. But failing to do so does not constitute an affirmative act.

Therefore, Ms. Cappel has alleged only two plausible affirmative acts by the EMT-Bs: dismissing the ALS unit from the scene, and filing an incident report stating that they did not assess Ms. Jones. The remaining question is whether these acts created a danger to Ms. Jones or

22

rendered her more vulnerable to danger than if they did not occur.  For the reasons explained below, they did not.

> ii.   *Neither dismissing the ALS unit from the Jones's home nor filing the incident report made Ms. Jones more vulnerable to harm than had the actions not occurred.*

The Third Circuit has said that an affirmative act "must amount to a '"restraint of personal liberty" that is "similar" to incarceration or institutionalization.'"  *Mears*, 24 F.4th at 884 (quoting *Ye*, 484 F.3d at 640-41).  The affirmative act "create[s] or enhance[s] a danger that deprives the plaintiff of his or her Fourteenth Amendment right[s]."  *Morrow*, 719 F.3d at 177; *see id.* at 178 (holding that a school district did affirmatively act by suspending a bully, but the act did *not* "create[] a new danger" to the students subjected to the bullying).

An affirmative act may make someone more vulnerable to harm if it "depriv[es] [them] of the ability to act on [their] own behalf."  *Mears*, 24 F.4th at 885; *see also Perez ex rel. Estate of Perez v. City of Philadelphia*, 701 F. Supp. 2d 658, 669 (E.D. Pa. 2010) (stating a limitation on the "freedom of action" is required for the final element of a state-created danger claim).  For example, in *Mears*, the nurse's affirmative act — leaving a mother alone in a room with her unstable son — deprived the mother "of the chance to decide whether to have an unsupervised visit or take extra precautions."  *Id.*  Critically, "all patient meetings" at the psychiatric hospital "were supposed to [be] supervise[d]," *id.* at 883, and the hospital's staff "controlled" all "movements within the facility," *id.* at 885.  With no choice but to remain in the room with her unstable son, the mother "was robbed" of her "freedom to avoid an unsupervised visit or take other precautions."  *Id.*; *see Rivas*, 365 F.3d at 197 (noting that, but for the actions of the first responders, the individual "could have remained in the apartment's bathroom for the duration of

his seizure without incident").[19]

Like abrogating someone's ability to act freely, a state actor may make someone more vulnerable to private harm by depriving them of a source of preexisting protection.  Consider *Kneipp*.  There, police officers separated an intoxicated woman from her husband as they walked home together from a tavern.  *Kneipp*, 95 F.3d at 1202.  The police let the husband continue walking, but not the woman — leaving her husband to "assume . . . the police officers were going to take her either to the hospital or to the police station."  *Id.*  But the police later let her walk home by herself, and eventually discovered she had fallen in an embankment.  *Id.* at 1203.  Her exposure to cold weather "resulted in permanent brain damage."  *Id.*

The Third Circuit held that "[a] jury could find that [the woman] was in a worse position after the police intervened than she would have been if they had not done so."  *Id.* at 1209.  The affirmative act — "the release of a would-be protector"[20] — deprived or "cut off" the woman's "private source of protection by giving [her husband] permission to go home alone, thereby increasing the danger" to her.  *Id.* at 1210; *see also L.R.*, 836 F.3d at 244 (concluding a teacher "responsible for the safety of very young children unable to care for themselves" deprived a child of preexisting protection by "releasing [her] to an unidentified adult, thereby terminating

---

[19] In *Mears*, the Third Circuit called out the narrowness of its holding, stating "the result would likely be different" if the mother "had knowingly agreed to an unsupervised visit." *Mears*, 24 F.4th at 885.  In other words, if the mother knowingly agreed *before* meeting with her unstable son that she would meet him without supervision, the nurse — by leaving the room — would not have deprived the mother of her freedom to *avoid* meeting him alone.  Leaving the room would not have made the mother more vulnerable to harm than had the nurse just stayed in the room — maintaining the status quo.

[20] *Vorobyev*, 2022 WL 1499278, at *3.  *But see Perez*, 701 F. Supp. 2d at 668 (stating the affirmative act in *Kneipp* was "detaining [the woman] in such a way as to limit her freedom of action and then releasing her in a visibly intoxicated state after allowing her husband to leave the scene").

her access to the school's care"); *Mears*, 24 F.4th at 885 (reasoning that the mother "entered the visitation room with the understanding that the visit would be supervised . . . [b]ut she could not leave on her own"); *cf. Brown v. Sch. Dist. of Phila.*, 456 F. App'x 88, 92 (3d Cir. 2011) (distinguishing *Kneipp* and holding school district did not take an affirmative act or "keep anyone else from helping" the victim of sexual assault).

Here, neither affirmative act by the EMT-Bs effected a restraint on Ms. Jones's liberty or freedom to act.  Start with waving off the ALS unit.  Dismissing the ALS unit did not inhibit Ms. Jones's ability to act.  *Mears* is highly instructive.  The "giving and taking away of support" by the nurse in *Mears* deprived the mother of her ability to choose to avoid her son.  The mother could not move from the psychiatric hospital's meeting room, and she could no longer choose whether she wanted to avoid seeing her son without supervision.  On the other hand, the EMT-Bs' affirmative act did not take away Ms. Jones's ability to make a choice or take any sort of action.  The act did not stop Ms. Jones from seeking out different private care from her family or elsewhere.  And the act did not limit Ms. Jones's access to other types of life-saving care outside of that provided by a state actor.

Further, waving off the ALS unit did not create or enhance some danger that did not exist prior to the EMT-Bs arriving.  The action itself did not expose Ms. Jones to some new type of private danger that did not exist prior to dismissing the ALS unit.  And the argument that, but for the EMT-Bs' act, Ms. Jones *could have* received treatment from the ALS unit — and been less vulnerable to harm — runs counter to the Supreme Court's ruling in *DeShaney*: an individual does not have an affirmative right to receive rescue services from a state actor.  Were the opposite true, any individual who learns — even after the fact — that a state actor could have employed some type of additional assistance may argue that the failure to administer such

assistance makes them more vulnerable to harm.  That line of reasoning would defeat the point of *DeShaney*.

Nor did the EMT-Bs' action deprive Ms. Jones of a preexisting source of protection. Dismissing the ALS unit differs from the affirmative act in *Kneipp*, where the release of the intoxicated woman's husband prevented her from accessing a prior source of protection (i.e., walking with her husband) that existed before the police officers acted.

Nevertheless, Ms. Cappel argues that *Kneipp* is instructive for a slightly different reason. She argues that, by "voluntarily assum[ing] responsibility for [Ms. Jones's] protection" and taking "custody . . . [of] her care," sending the paramedics team away increased her risk of harm. DI 44 at 4 (quoting *Kneipp*, 95 F.3d at 1203); *see also Mears*, 24 F.4th at 885 (the nurse "assumed care but then withdrew it, leaving [the mother] in a more dangerous position").  For one, this argument sounds like a tort-esque "breach of duty of care" that the Supreme Court in *DeShaney* cautioned against imposing.  But the argument misses the essential final piece of a state-created danger analysis that the Third Circuit focuses on: when does the withdrawal of care result in added vulnerability to harm that deprives someone of their constitutional rights?  The assumption of care alone in *Kneipp* is not what enhanced the danger to the intoxicated woman; the woman's inability to freely walk home with her husband, caused by the police officers' release of her "would-be protector," is what created a danger that did not exist before the police acted.  *Vorobyev*, 2022 WL 1499278, at *3.

The same reasoning applies when contrasting the present facts with *Mears*.  Clearly, the nurse in *Mears* withdrew her care of the mother.  But the withdrawal of this preexisting source of protection caused the mother to be left in a more vulnerable state, and thus be deprived of her freedom to avoid her unstable son.  Here, the withdrawal of the ALS unit did not make Ms. Jones

26

lose some source of protection she had in the first place.  Nor did the affirmative act cabin her family's ability to assist her.  Therefore, waving off the ALS unit did not limit her access to a preexisting source of protection from private harm.

Next, the act of filing an allegedly false incident report did not make Ms. Jones more vulnerable to harm than had the report never been filed.  Ms. Cappel argues that "an active and concerted effort by" the EMT-Bs to "conceal" their conduct "could constitute an affirmative act" because it kept "anyone else from realizing what was wrong and coming back to help" Ms. Jones.  DI 44 at 7-8 (quoting *Doe v. Allentown Sch. Dist.*, 2007 WL 2814587, at *6 (E.D. Pa. Sept. 21, 2007)).  This may be true, but the argument is not in accord with *DeShaney*.  Ms. Jones did not have a constitutional right to receive follow-up emergency medical services from the Fire Department's first responders even if the incident report accurately depicted her condition.

Ms. Cappel's reliance on *Doe* to support this argument is misplaced.  In *Doe*, the after-the-fact concealment by school officials prevented "*private* source[s] of rescue" from "coming forward" to help a student who was sexually assaulted multiple times.  2007 WL 2814587, at *6 (emphasis added).  The court compared the efforts to cover up a chain of assaults to the police officers in *Kneipp* who separated the intoxicated woman from a private source of security.  Here, filing the false incident report did not block Ms. Jones from receiving private assistance.

In sum, neither affirmative act we identified created or enhanced a danger to Ms. Jones, and they did not impose a restraint on Ms. Jones's liberty to act.  For this reason, she fails to state a plausible state-created danger claim against the EMT-Bs.[21]

      2.  *Ms. Cappel's* Monell *and supervisory liability claims fail without a*

---

[21] To summarize for anyone who, understandably, struggled to follow the thread: the viability of plaintiffs' constitutional claim here turns on the nuances of one of the three prongs of the fourth element of a judicially created exception to a judicially created defense to liability.

*plausible underlying constitutional violation.*

The Supreme Court in *Monell* held that "[l]ocal governing bodies . . . can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  436 U.S. at 690.  But the Third Circuit has said that an underlying constitutional violation must occur to hold a governing body liable.  *See Brown v. Commonwealth of Pa., Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003); *see also id.* (concluding *Monell* claim failed where the City of Philadelphia "was under no constitutional obligation to provident competent rescue services"); *see also Baez v. Lancaster County*, 487 F. App'x 30, 32 (3d Cir. 2012) (holding a "[p]laintiff must establish an underlying constitutional violation to attribute liability to [a municipal entity] pursuant to *Monell*").  This same logic applies for a § 1983 claim based on supervisory liability.  *See Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010) ("[A]ny claim that supervisors directed others to violate constitutional rights necessarily includes as an element an actual violation at the hands of subordinates."); *Talley v. Varner*, 786 F. App'x 326, 32 (3d Cir. 2019) ("[S]upervisory liability . . . claims cannot be maintained by themselves under § 1983.").

Here, Ms. Cappel's second claim for relief is a *Monell* claim against the Fire Department, and her third claim is a supervisory liability claim against individual Fire Department defendants. Because the well-pleaded allegations fail to state a plausible constitutional claim against Mr. Marshall and Mr. Kisela, both claims fail.[22]

---

[22] For the same reasons, count two of Ms. Cappel's complaint (her *Monell* claim against Aston Township) and count three (her supervisory liability claim against individuals on Aston Township's Fire Committee) fail.

**B.  Ms. Cappel pleads plausible claims under the ADA and Rehabilitation Act because the EMT-Bs regarded Ms. Jones as having COVID-19.**

Under Title II of the ADA, Congress prohibits a "public entity" from denying a "qualified individual with a disability" of "the services, programs, or activities of [the] public entity," or from being "subjected to discrimination by any such entity."  42 U.S.C. § 12132. These public entities are "vicariously liable for the acts of [their] employees."  *Waters v. Amtrak*, 456 F. Supp. 3d 666, 671 (E.D. Pa. 2020).

Title II has two main components — both defined by Congress.  First, Congress includes "any State or local government" in its definition of "public entity" under the ADA. § 12131(1)(A).  Second, Congress defines a "qualified individual with a disability" under Title II of the ADA as follows:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*Id.* § 12131(2).  And "[t]he ADA defines 'disability,' 'with respect to an individual,' as

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 n.2 (1999) (quoting § 12102(2)).  Major life activities, according to Congress, "include, but are not limited to, caring for oneself, . . . walking, standing, lifting, bending, speaking, [and] breathing."  § 12102(2)(A).

Here, the Fire Department's only argument in favor of dismissing Ms. Cappel's ADA and

Rehabilitation Act claims[23] is that Ms. Jones does not meet the definition of "an individual with a disability." DI 57 at 24. The Fire Department fixates on the "regarded as" prong of the definition of "disability." In the Fire Department's view, "regarding" someone as *potentially* having COVID" is "not enough to establish the existence of a disability." *Id.* at 27. Said different, "[t]he potential of having a disability" and actually "having a disability" are distinct concepts. *Id.*

Ms. Cappel sees things differently. She argues that Mr. Marshall and Mr. Kisela treated Ms. Jones as if she had COVID-19. See DI 59 at 12-13. The EMT-Bs evaluation, according to Ms. Cappel, deviated from the Fire Department's protocol for individuals like Ms. Jones because they "regarded her as Covid positive." *Id.* at 13.

We confine our analysis to the Fire Department's only argument: whether Ms. Cappel has plausibly alleged that Ms. Jones was regarded as having a disability. We conclude that she was.

To state a "regarded as" disability claim, an individual must "establish[] that he or she

---

[23] The Third Circuit "consider[s] Title II and Section 504 [of the Rehabilitation Act] claims together because 'the substantive standards for determining liability are the same.'" *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288 (3d Cir. 2019) (quoting *McDonald v. Com. of Pa. Dep't of Pub. Welfare Polk Ctr.*, 62 F.3d 92, 95 (3d Cir. 1995)). To streamline our analysis, we will refer to only the ADA for both causes of action.

Notably, however, there appears to be a difference in the relief Ms. Cappel seeks for her ADA and Rehabilitation Act claims unaddressed by the Fire Department and Aston Township. Ms. Cappel seeks declaratory relief, injunctive relief, and attorneys' fees for her ADA claim. *See* DI 50-2 ¶¶ 94-96; *see also id.* at 33. But she seeks compensatory damages for her Rehabilitation Act claim. *Id.* ¶ 104; *see also id.* at 33. The Third Circuit requires a showing of intentional discrimination when requesting compensatory damages under the ADA and Rehabilitation Act. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013). The Third Circuit has said "a showing of deliberate indifference may satisfy a claim for compensatory damages." *Id.* at 263. Therefore, to get compensatory damages for her Rehabilitation Act claim, Ms. Cappel will need to support her allegation that Aston Township's and the Fire Department's "conduct showed deliberate indifference to [Ms. Jones's] rights." DI 50-2 ¶ 102.

has been subjected to an action prohibited" by the ADA "because of an actual *or perceived* physical or mental impairment whether or not the [individual's] impairment limits or is perceived to limit a major life activity."  § 12102(3)(A) (emphasis added); *see also Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 246 (3d Cir. 2020) (quoting § 12102(3)(A)); *Matias v. Terrapin House, Inc.*, 2021 WL 4206759, at *4 (E.D. Pa. Sept. 16, 2021).  The reason for "regarded as" claims, according to the Third Circuit, is that "being perceived as disabled 'may prove just as disabling' to a person as another type of physical or mental impairment." *Eshleman*, 961 F.3d at 246 (quoting *Williams v. Phila. Hous. Auth. Police Dep't¸* 380 F.3d 751, 774 (3d Cir. 2004)).

      "Regarded as" claims require courts to decide whether a public entity perceived someone as having a particular impairment, and whether that impairment is a disability under the ADA.  On the second point, courts across the country have wrestled with whether COVID-19 is a disability under the ADA.  Sometimes yes, sometimes no.  *See Whitebread v. Luzerne County*, 2023 WL 349939, at *4 (M.D. Pa. Jan. 20, 2023) (referencing as an example the EEOC's guidance "that COVID-19 may be a disability, but it is not always a disability"); *Matias*, 2021 WL 4206759, at *4 ("Additionally, the [EEOC's] guidance states that certain forms of COVID-19 can 'substantially limit major life activity,' *inter alia*, one's respiratory function, gastrointestinal function, and brain function, for periods lasting months after first being infected."); *see also Baum v. Dunmire Prop. Mgmt., Inc.*, 2022 WL 889097, at *4 (D. Colo. Mar. 25, 2022) ("Recent regulatory guidance suggests that, in some circumstances, COVID-19 may be considered a disability under the ADA.").

      So, when do courts consider COVID-19 as a disability?  To start, well-pleaded allegations must exist "regarding [the] symptoms or impairments as a result of [a] COVID-19

diagnosis," as well as allegations of the "'major life activity' or activities [the plaintiff] was unable to perform as a result." *Payne v. Woods Servs.*, 520 F. Supp. 3d 670, 679 (E.D. Pa. 2021) (holding plaintiff with COVID-19 diagnosis failed to sufficiently plead a "regarded as" claim with nothing more than conclusory allegations); *see Whitebread*, 2023 WL 349939, at *4 ("The complaint is devoid of these factual allegations to enable us to determine whether Whitebread had, in fact, tested positive for the virus, the nature of her symptoms before the test, whether her stepson in fact tested positive for COVID-19 or the nature and length of his symptoms."); *see also Worrall v. River Shack LLC*, 2022 WL 3371345, at *3 (N.D. Tex. Aug. 15, 2022) ("While the issue of what a plaintiff claiming disability based on COVID must plead to satisfy this burden is far from settled, a plaintiff must, *at minimum*, allege how his specific COVID symptoms impacted specific major life activities."); *cf. Brown v. Roanoke Rehab. & Healthcare Ctr.*, 586 F. Supp. 3d 1171, 1177 (M.D. Ala. 2022) (denying motion to dismiss "actual disability" and "regarded as" disability claims where well-pleaded facts existed regarding symptoms of COVID-19).

We also know that courts do not treat the potential of being exposed to COVID-19 as a disability. *Parker v. Cenlar FSB*, 2021 WL 22828, at *6 (E.D. Pa. Jan. 4, 2021) ("[N]otwithstanding whether contracting COVID-19 is a disability under the ADA, possible *exposure* to COVID-19 is not 'a physical or mental impairment that substantially limits one or more major life activities.'"); *see also Hice v. Mazzella Lifting Techs., Inc.*, 589 F. Supp. 3d 539, 550 (E.D. Va. 2022) ("[P]ossible future exposure to COVID-19 does not constitute an impairment under the ADA."); *Speaks v. Health Sys. Mgmt., Inc.*, 2022 WL 3448649, at *5 n.6 (W.D.N.C. Aug. 17, 2022) (quoting *Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1315 (11th Cir. 2019)) (noting that "'the disability definition in the ADA does not cover" a

situation "where an employer perceives a person to be presently healthy *with only a potential to become ill and disabled in the future*" (emphasis added)).

Finally, we know an exception to treating COVID-19 — and any other impairment — as a disability exists where the alleged impairment is "transitory and minor."  § 12102(3)(B) (disqualifying "transitory and minor" impairments as disabilities for "regarded as" claims).  An individual claiming an ADA violation must plausibly allege a non-transitory *or* non-minor impairment.[24]

Further, "the issue of whether an impairment is 'minor' is a separate and distinct inquiry from whether it is 'transitory.'"  *Eshleman*, 961 F.3d at 247.  A "transitory" impairment has "an actual or expected duration of 6 months or less."  § 12102(3)(B).  Whether an impairment is "minor" is determined "on a case-by-case basis" by "consider[ing] such factors as the symptoms and severity of the impairment, the type of treatment required, the risk involved, and whether any kind of surgical intervention is anticipated or necessary."  *Eshleman*, 961 F.3d at 249.  With separate definitions, "the perceived impairment [must be] objectively *both* transitory and minor" for the exception to apply.  *Id.*[25]

---

[24] The regulatory description of the "transitory and minor" exception states that an entity must "establish," as a "defense," that a disability is "transitory and minor."  29 C.F.R. § 1630.15; *see also Cook v. City of Philadelphia*, 94 F. Supp. 3d 640, 645 n.4 (E.D. Pa. 2015).  But the Third Circuit does not treat the exception as an affirmative defense; it has stated that the "statutory text" of the ADA "demands a non-transitory or non-minor perceived impairment."  *Eshleman*, 961 F.3d at 246 n.25 ("[O]ur caselaw has sometimes described the limitation on 'transitory and minor' impairments as an 'affirmative defense.'  We think this is imperfect shorthand . . . ." (citation omitted)).

[25] *But see Librandi v. Alexion Pharms., Inc.*, 2023 WL 3993741, at *7 (D. Conn. June 14, 2023) ("[U]nder the ADA, individuals are not 'disabled' when they have conditions that are 'transitory,' . . . ."); *Linne v. Alameda Health Sys.*, 2023 WL 3168587, at *2 (N.D. Cal. Apr. 28, 2023) ("[B]ecause COVID-19 is an impairment that is considered transitory, even being regarded as having, or potentially contracting, COVID-19 is regarded as having an impairment

Here, the allegations plausibly show that the EMT-Bs perceived Ms. Jones as having COVID-19.  And as a result of their perception, the EMT-Bs denied her of potential treatment and benefits provided by the Fire Department.  Several allegations support this conclusion.  For example, before Mr. Marshall and Mr. Kisela arrived at the Jones's home, they discussed how [Mr.] Kisela would stay outside" and not evaluate Ms. Jones "because they suspected she might have Covid."  DI 50-2 ¶ 53.  The EMT-Bs knew they were responding to a 911 call stating that Ms. Jones had difficulty breathing — a COVID-19 symptom.  *See id.* ¶ 36; *see also Matias*, 2021 WL 4206759, at *5 ("The CDC indicates that COVID-19 carries with it symptoms including . . . difficulty breathing . . . .").  Mr. Kisela, the EMT-B with more experience, *see* DI 50-2 ¶ 38, refused to evaluate Ms. Jones after Mr. Marshall asked him to, stating that he had "a wife and kids to think about," *id.* ¶ 51.  And Mr. Marshall even commented that Ms. Jones's condition is "what Covid patients look like."  *Id.* ¶ 46.

The Fire Department argues that Ms. Jones never tested positive for COVID-19, thus, the EMT-Bs perceived her as *possibly* having COVID-19.  But the allegations paint a different picture — one showing that Mr. Marshall and Mr. Kisela catered their medical response and evaluation of Ms. Jones based on their perception that she had COVID-19.  The well-pleaded facts make it clear that the EMT-Bs perceived her condition as "substantially limit[ing] a major life activit[y]."  § 12102(3)(A).  Therefore, we agree with Ms. Cappel that the EMT-Bs regarded Ms. Jones as having COVID-19.

---

that is transitory — and therefore falls outside the scope of the definition of disability."); *Thompson v. City of Tualatin*, 2022 WL 742682, at *2 (D. Or. Mar. 11, 2022) ("[E]mployees cannot bring claims for being regarded as having an impairment that is 'transitory and minor,' meaning 'an impairment with an actual or expected duration of 6 months or less.'" (quoting § 12102(3)(B))).

The more granular question is whether perceiving Ms. Jones to have COVID-19 equates to perceiving Ms. Jones to have a disability.  For several reasons, and based on the well-pleaded allegations, we think so.

First, Ms. Cappel's allegations amply lay out the threatening symptoms Ms. Jones suffered and how they substantially limited her major life activities.  *See, e.g.*, DI 50-2 ¶¶ 35 ("[Ms. Jones] was struggling to breath[e], could not walk, and had an extremely low blood oxygen level."); 40 ("[Ms. Jones] was struggling to breathe, had a fever, and could no longer walk."), 41 ("[Mr. Marshall's] own oximeter indicated that [Ms. Jones's] blood oxygen had fallen further and was now at 35%."), 46 ("[Ms. Jones] was panting rapidly like a dog, her chest heaving up and down.").  The allegations are not "threadbare recitals of the elements of" an ADA claim; they repeatedly show Ms. Jones suffering from a serious impairment making it difficult to perform basic life functions.  *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012).

Second, Ms. Cappel is not alleging that Ms. Jones's potential *exposure* to COVID-19 at some future time is the disability at issue.  The many court decisions that the Fire Department cites to support this contention are inapposite.  Simply put, future exposure is not the same as the present case — where Ms. Cappel is alleging that Ms. Jones suffered contemporaneously from COVID-19 symptoms that hindered her ability to breathe or walk.

Third, and following the Third Circuit's guidance in *Eshleman*, Ms. Cappel plausibly alleges a non-minor disability — making the "transitory and minor" exception inapplicable at the pleadings stage.  Although the Fire Department and Aston Township fail to address the

"transitory and minor" exception[26] in their briefing, Ms. Cappel sufficiently demonstrates that Ms. Jones suffered from a non-minor impairment.  Ms. Jones could not walk, struggled to breathe, and had a very low blood-oxygen level.  *See* DI 50-2 ¶¶ 35-36, 40-41.  The allegations show a severe impairment that is anything but minor.

Therefore, Ms. Cappel has plausibly alleged that Mr. Marshall and Mr. Kisela regarded her as having a disability.  Her ADA claim will move to discovery.

### C.  Ms. Cappel's state law claims for intentional infliction of emotional distress may proceed to discovery, but not the other claims.

Ms. Cappel's second amended complaint includes five causes of action under Pennsylvania law.  Through multiple rounds of briefing and amendments to Ms. Cappel's complaint, the specific parties implicated by each state law claim have — to say the least — fluctuated.

To best organize our analysis, we begin by recapping what claims Ms. Cappel is asserting.  Counts six and seven of Ms. Cappel's second amended complaint assert two "gross negligence" causes of action.  *See* DI 50-2 at 26-30.  Count eight is intentional *or* negligent infliction of emotional distress.  *See id.* at 31.  And counts nine and ten are wrongful death and survival causes of action brought by the estate of Ms. Jones under Pennsylvania law.  *See id.* at 31-32.

Next, the parties Ms. Cappel is no longer asserting state law claims against.  She has explained that she is not suing Aston Township or the Fire Department under state law.  *See* DI 43 at 12; DI 44 at 17-18.  She also has stated that she "will voluntarily dismiss defendants

---

[26] We express no opinion on whether Ms. Cappel alleges that Ms. Jones suffered from a non-transitory disability.

Dawson, Morgan, and Joyce acting in their individual capacities from all claims." DI 59 at 2. These three individuals had roles within the Fire Department. On that basis, those five defendants are dismissed from Ms. Cappel's state law claims.

We also note that defendants Prospect Crozer, LLC and Prospect CCMC, LLC have *not* moved to dismiss any of Ms. Cappel's state law claims. As such, they are not included in our analysis.

Remaining are gross negligence, emotional distress, wrongful death, and survival actions against two groups of individuals.[27] The first "group" are members of Aston Township's Fire Committee — Joe McGinn, Jr., Nancy Bowden, and Les Berry. The individuals in the second "group" are affiliated with the Fire Department — Mr. Marshall, Mr. Kisela, Department Chief Michael Evans, and a "John Doe" medical director "employed by or a contracted agent of Aston Township, ATFD, and/or Crozer Health/CMC." DI 50-2 ¶ 19.

We first address the claims against each group in turn. Then we analyze the wrongful death and survival causes of action.

> 1. *Ms. Cappel's state law claims against individuals on the Aston Township Fire Committee are barred by the PSTCA, except for her intentional infliction of emotional distress claim.*

---

[27] The claims are asserted against the two groups of individuals in their individual capacity. Ms. Cappel alleges "each and all defendants" are sued "in both their individual and official capacities." DI 50-2 ¶ 3. But, as the Fire Department points out in its motion to dismiss, the official capacity claims "are not cognizable unless" Ms. Cappel states a plausible claim against the municipal entities. DI 39-1 at 31; *see Moore v. Lower Frederick Township*, 2022 WL 657068, at *12 (E.D. Pa. Mar. 4, 2022) ("Official capacity suits are treated as suits against the municipality."); *Whaumbush v. City of Philadelphia*, 747 F. Supp. 2d 505, 510 n.2 (E.D. Pa. 2010) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)) (dismissing tort and § 1985 claims against defendants sued in official capacity "as they are duplicative of [p]laintiffs' claims against the City"). We agree with the Fire Department and dismiss Ms. Cappel's official capacity claims.

The Pennsylvania legislature excepts any "local agency" from "liabil[ity] for any damages on account of any injury to a person or property caused by the act of the local agency or an employee thereof." 42 Pa. Cons. Stat. § 8541.[28] The "defense of official immunity" applies to "[a]n employee of a local agency" sued in his or her individual capacity "only to the same extent as his employing local agency." *Id.* § 8545; *see Moore*, 2022 WL 657068, at *8 ("Government officials are entitled to immunity to the same extent as their employing agency, so long as the claim is brought under Pennsylvania law for acts performed within the scope of their employment."); *Milbourne v. Baker*, 2012 WL 1889148, at *5 (E.D. Pa. May 23, 2012) (citing § 8545) ("With respect to plaintiff's *individual-capacity* claim . . . the [PSTCA] states that employees of a local agency are entitled to the same immunity as their employer." (emphasis added)).

But under Pennsylvania law, "there is no immunity against *personal* capacity claims for civil damages caused by acts which are within the scope of an office or duties where the local employee has engaged in 'a crime, actual fraud, or *willful misconduct*.'" *El v. Matson*, 2023 WL 4134723, at *9 n.8 (W.D. Pa. June 22, 2023) (emphasis added) (quoting § 8550); *see also Farrell*

---

[28] There are nine statutory exceptions to this grant of local agency immunity:
(1) vehicle liability,
(2) care, custody, or control of personal property,
(3) real property,
(4) trees, traffic controls, and street lighting,
(5) utility service facilities,
(6) streets,
(7) sidewalks,
(8) care, custody, or control of animals, and
(9) sexual abuse.

§ 8542(b)(1)-(9). These exceptions are "strictly construed." *Moore v. Lower Frederick Twp.*, 2022 WL 657068, at *8 (E.D. Pa. Mar. 4, 2022).

*v. Northampton County*, 2015 WL 4611298, at *8 (E.D. Pa. Aug. 3, 2015); *Torres v. Allentown Police Dep't*, 2014 WL 4081477, at *10 (E.D. Pa. Aug. 18, 2014).  "Willful misconduct has been defined by the Pennsylvania Supreme Court as 'conduct whereby an actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied.'"  *Vargas v. City of Philadelphia*, 783 F.3d at 975 (quoting *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994)).  And "Pennsylvania courts have . . . concluded that section 8550 'only abolishes immunity for willful misconduct which pertains to local government *employees* . . . and does not affect the immunity of local agencies.'"  *Viney v. Jenkintown Sch. Dist.*, 51 F. Supp. 3d 553, 557 (E.D. Pa. 2014) (quoting *King v. Breach*, 540 A.2d 976, 979 (Pa. Commw. Ct. 1988)).  In other words, the willful misconduct exception applies only for local agency employees — not the local agency itself.

The Third Circuit has said that "'willful misconduct' is synonymous with the term 'intentional tort.'"  *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006) (quoting *Renk*, 641 A.3d at 293); *see L.H. v. Pittston Area Sch. Dist.*, 130 F. Supp. 3d 918, 930 (M.D. Pa. 2015) (holding defendant was not entitled to official immunity because an intentional infliction of emotional distress claim, "by its very nature, is a claim of willful misconduct"); *McCowan v. City of Philadelphia*, 2021 WL 84013, at *31 n.25 (E.D. Pa. Jan. 21, 2021).   But conduct that is grossly negligent or reckless "is insufficient to substantiate a finding of willful misconduct."  *Jackson v. City of Philadelphia*, 2015 WL 2070084, at *6 (E.D. Pa. May 4, 2015).

Here, Aston Township argues that the three members of its fire committee are immune from suit.  DI 34 at 9-10.  It argues that Ms. Cappel failed to proffer facts showing that the fire committee members engaged in criminal or fraudulent activity, or that they acted with "actual malice or willful misconduct."  DI 54 at 5.  Ms. Cappel disagrees, arguing that the exceptions for

"actual malice" or "willful misconduct" apply.  *See* DI 43 at 13.

We mostly agree with Aston Township.  Ms. Cappel's second amended complaint does not allege facts sufficient for the willful misconduct exception.  The allegations that Ms. Cappel directs us to in support of her position, *see* DI 43 at 12-13 (citing DI 29 ¶¶ 68-70), fail to (1) demonstrate how any of the individual fire committee members acted in a way to "bring about" Ms. Jones's injuries, or (2) were aware that any of their purported actions would result in the injuries.

But Ms. Cappel's intentional infliction of emotional distress claim, "by its very nature, is a claim of willful misconduct."  *Pittston Area Sch. Dist.*, 130 F. Supp. 3d at 930.  The fire committee members are not entitled to official immunity with respect to that cause of action.  That said, because Aston Township does not address the plausibility of Ms. Cappel's intentional infliction of emotional distress claim, we will not either.  The claim will move forward to discovery.[29]

> 2.  *Ms. Cappel's state law claim for intentional infliction of emotional distress may proceed to discovery against the Fire Department employees.*

Like Aston Township, the Fire Department argues that Ms. Cappel does not plausibly allege "crime, fraud, or malicious or willful misconduct" on the part of Mr. Marshall, Mr. Kisela, Mr. Evans, and the John Doe medical director.  DI 39-2 at 29-30.  We agree, except for the allegations of intentional infliction of emotional distress.  As discussed above, claims of intentional infliction of emotional distress under Pennsylvania law are claims that allege willful

---

[29] Ms. Cappel's claim for punitive damages may proceed against the fire committee members sued in their individual capacity for intentional infliction of emotional distress.  *See Torres*, 2014 WL 4081477, at *12 (discussing PSTCA allowing claim for punitive damages for intentional tort claims against state actors in individual capacity).

misconduct.  Therefore, official immunity would not apply to Mr. Marshall, Mr. Kisela, Mr. Evans, and John Doe for this claim.

The Fire Department does not address the merits of Ms. Cappel's intentional infliction of emotional distress claim against Mr. Marshall, Mr. Kisela, Mr. Evans, or John Doe, so neither will we.  That claim moves to discovery.[30]

> 3. *The wrongful death and survival causes of action move to discovery to the extent they are based on the claims not dismissed.*

Causes of action "under the Pennsylvania Wrongful Death Act and the Pennsylvania Survivor act . . . are strictly derivative — that is, they merely 'provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death.'" *Duvall v. Hustler*, 447 F. Supp. 3d 311, 338 (quoting *Sullivan v. Warminster Township*, 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011)).  "[A] viable claim on one or more of the underlying causes of action" must exist for a claim to assert wrongful death and survival claims. *Johnson v. City of Philadelphia*, 105 F. Supp. 3d 474, 483 (E.D. Pa. 2015).  "So, 'if no underlying tort has been pled, there can be no wrongful-death or survival action.'" *Redclift v. Schuylkill County*, 2022 WL 3951356, at *11 (M.D. Pa. Aug. 31, 2022) (quoting *McCracken v. Fulton County*, 2020 WL 2767577, at *27 (M.D. Pa. May 28, 2020)); *see also McDonald-Witherspoon v. City of Philadelphia*, 481 F. Supp. 424, 458 (E.D. Pa. 2020) (distinguishing "viable causes of action" from ADA and Rehabilitation Act claims at summary judgment stage to determine whether wrongful death and survival causes of action may proceed).

Here, the only argument raised against Ms. Jones's estate's wrongful death and survival

---

[30] As with the fire committee members, Ms. Cappel may seek punitive damages from Mr. Marshall, Mr. Kisela, Mr. Evans, and John Doe medical director in their individual capacity for her intentional infliction of emotional distress claim.

causes of action is brought by Aston Township.  It argues that the causes of action are barred by

the PSTCA.  *See* DI 34 at 11-12.  But that argument misinterprets the rule that wrongful death

and survival causes of action are "derivative" claims.  Because Ms. Cappel states plausible ADA,

Rehabilitation Act, and intentional infliction of emotional distress claims against certain

individuals, the wrongful death and survival causes of action may proceed on those bases.

**V.      Conclusion**

We conclude the following:

- Ms. Cappel's proposed amendments to her complaint are not futile.  We grant her motion for leave to file a second amended complaint and deem it as filed.  *See* DI 50.

- Regarding the pending motions to dismiss (DI 34, 39):

    o Count I (Fourteenth Amendment) – The allegations fail to state a plausible violation of Ms. Jones's Fourteenth Amendment rights.  We grant the Fire Department's and Aston Township's motions to dismiss *without* prejudice.

    o Count II (*Monell*) – We grant Aston Township's and the Fire Department's motions to dismiss *without* prejudice because the allegations fail to state a plausible, underlying constitutional violation.

    o Count III (Supervisory Liability) – Absent a plausible, underlying constitutional violation, Ms. Cappel's supervisory liability claims fail.  We dismiss the claim *without* prejudice.

    o Count IV (ADA) – Ms. Cappel states a plausible ADA cause of action.  We grant her leave to amend her complaint to add the claim.  And, as such, we reject defendants' arguments favoring dismissal of the ADA cause of action.  The cause of action will proceed to discovery.

    o Count V (Rehabilitation Act) – For the same reasons as her ADA claim, Ms. Cappel states a plausible Rehabilitation Act claim.  We grant her leave to amend her complaint to add the claim.  The cause of action will proceed to discovery.

    o Counts VI-VIII (state law claims)

        ▪ Ms. Cappel's state law causes of action against members of the Aston Township Fire Committee are dismissed *with* prejudice, except for her intentional infliction of emotional distress claim.

- The Fire Department's motion to dismiss Ms. Cappel's state law causes of action against Mr. Marshall, Mr. Kisela, Department Chief Michael Evans, and a "John Doe" medical director is granted in part and denied in part. Only Ms. Cappel's intentional infliction of emotional distress claim against the individuals will move to discovery. The remaining claims are dismissed *with* prejudice.

- <u>Counts IX-X (wrongful death and survival action claims)</u> – Ms. Cappel's wrongful death and survival action claims may proceed to discovery, but only to the extent they are predicated on the following causes of action:
  - Count IV (ADA)
  - Count V (Rehabilitation Act)
  - Count VIII (Intentional Infliction of Emotional Distress as to the fire committee members, Mr. Marshall, Mr. Kisela, Department Chief Michael Evans, and a "John Doe" medical director).